UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| MILLARD BURTON HARMAN, | |
| Plaintiff, | |
| v. | Civil Action No. 3:10–CV–759 |
| DAVID A. BUNCH *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Motion for Summary Judgment filed by

Defendants David A. Bunch and Kenneth Droddy in this § 1983 action. (ECF No. 10). For the

reasons stated below, the Court will GRANT the summary judgment motion.

## I. BACKGROUND

### A. Factual Background[1]

#### 1. The Lease

Plaintiff Harman leased property he owned at 17502 White Oak Road in Dinwidde

County, Virginia, to Guy Winks. The lease, which began on September 1, 2009, and ended

on August 31, 2011, provided that the rental premises included the "house and grounds

together with all appurtenances." (Harman Dep., Ex. 1, ECF No. 11-1, at 29). Initially, Mr.

Winks lived in the leased house with his wife Lesly and their three children.

---

[1]    These facts are as presented in the Defendants' Statement of Undisputed Facts. (Mem. Supp,
ECF No. 11, at 2-14). The Plaintiff's disputes with those facts are discussed where relevant.

Harman's property included a detached garage, which the Winkses considered to be part of the leased premises.[2] According to Mrs. Winks, Harman provided the family with access to a key to the detached garage and stored it above the doorframe so that both the Winkses and Harman could access the detached garage.[3] On April 19, 2010, approximately seven months after the Winkses' lease began, Dinwiddie County granted Harman a new address, 17502A White Oak Road, for the detached garage with an easement through the driveway to the house.

### 2. Harman and Mrs. Winks

In late September or early October 2009, Harman began appearing at the Winkses' leased property when Mr. Winks was not at home. During this time, Harman worked in the detached garage but did not come to the door of the house.

At the end of October, Harman began appearing at the property from the time Mr. Winks left the home for work until shortly before he returned. Harman's need to fix things in the house began to increase during this time; however, Mrs. Winks rarely allowed him to fix things in the house because his comments made her uncomfortable. For example, he would comment about how unattractive his wife was, how his wife was a bitch, and how he did not understand why women were so attracted to him.

In November 2009, Mrs. Winks's uncle moved in with the family. Initially, Harman did not seem to have a problem with the uncle's addition to the household; however, after approximately a month, Harman appeared to become angry with the family and began

---

[2]   The Plaintiff argues that the detached garage was not included in the lease.
[3]   Harman contends that he did not provide the Winkses with a key to the detached garage.

2

complaining about being broke. He continued to show up regularly to work in the detached garage.

Near the end of December 2009, Harman informed the Winkses that he did not like having someone living for free in the house he built and did not want the uncle there. The Winkses explained that the uncle was providing childcare because Mrs. Winks was returning to work. The uncle offered to work for Harman in exchange for living there; Harman agreed and the uncle began helping Harman when needed.

After January 1, 2010, Harman claimed that because the septic tank on the property was meant for two adults and two children, he would place a portable toilet outside the house for the uncle to use. The Winkses researched the issue and discovered that the septic tank was sufficient for the three adults and the children. They offered to pay Harman, but he declined the offer, saying he was just stressed about being broke.

In mid-January 2010, the Winkses found a body shop sign in the yard and on the corner of the property facing an intersection. In addition, Harman removed the Winkses' mailbox and installed two new mailboxes with no addresses on them. He informed them that he would be changing their address so he could use the current one for his body shop.

Harman began performing auto body work in the detached garage; however, the Winkses asked him to stop after "a car full of objectionable people [was] parked in front of the garage." (Mem. Supp., ECF No. 11, at 5). The family indicated they were not comfortable with the body shop's clientele being outside the home when only Mrs. Winks, her disabled uncle, and the children were in the home. Harman said he would stop working in the detached garage if the uncle moved out.

On February 21, 2010, the Winkses learned that Harman had posted an ad on Craigslist in an attempt to rent the premises. Three days later, Harman and the Winkses signed a lease addendum that provided, in relevant part, that the tenants in the leased property would be three adults and three children, that the "landlord may conduct automotive repair work during normal business hours in the detached garage . . . ," and that the tenants would assume responsibility for septic tank service. (Lesly Winks Aff., Ex. A, ECF No. 11-2, at 6-7). When Harman and the Winkses met to discuss the agreement,

> Harman confessed he had a crush on Mrs. Winks and said she reminded him of his past lover. He also made comments to the effect that the "sins of the flesh cannot be denied" and that he found Mrs. Winks "alluring" when she took the trash out. Both Mr. and Mrs. Winks told Harman his comments were inappropriate.

(Mem. Supp., ECF No. 11, at 5).

During this time period, Harman worked in the detached garage regularly, but he also began walking into the house without notice and without knocking. Despite the Winkses' requests that he stop doing this, he simply apologized and repeated the behavior. Harman stopped coming to the premises when Mrs. Winks returned to work in mid-March 2010.

On May 1, 2010, Harman notified the Winkses that he was increasing their rent by $200. On May 7, Mrs. Winks stopped working, and Mr. Winks mentioned this to Harman. On May 8, Harman brought heavy machinery to the property and tilled the yard, saying he was putting in new grass.

On May 10, Harman began working in the detached garage again. The next day, "Mrs. Winks was outside emptying the trash when Harman approached her. He told her how he thought his wife was so overweight and he could not believe how quickly Mrs.

4

Winks had lost weight after the baby. Mrs. Winks thanked him and went back inside." *Id.* at 6.

On May 12, the Winkses lost power during a storm. The next day, Harman called Mr. Winks and said he would bring a generator for them to use. When he brought the generator over, he asked Mrs. Winks to come outside so that he could show her how to turn off the generator. "He followed Mrs. Winks back to the house and said that her clothes looked like they were fitting better and that she must have lost some weight. Mrs. Winks asked him to stop looking at her and to finish what he was doing." *Id.*

On May 18, Harman showed up at the house again to work in the detached garage. Mrs. Winks was doing laundry inside when Harman opened the door, stepped inside, and began talking to her. He apologized after she told him he could not walk in the house without knocking.

> He then began to tell Mrs. Winks again of how she reminded him of his past lover who was dead. He asked when her birthday was and Mrs. Winks told him December. He said so was hers. He remarked it was crazy how much Mrs. Winks looked like her and acted like her. Mrs. Winks asked him to leave and locked the door after him.

*Id.* at 7. On May 20, Harman again came into the house without knocking, this time standing by the dining room table while Mrs. Winks was playing with her children. When asked why he was in the house without knocking, Harman said he forgot to knock.

Mrs. Winks states that on numerous occasions, Harman appeared when she went outside. She also observed him sleeping in the detached garage or in his SUV while parked in front of the house.[4]

---

[4]    Mrs. Winks attributes several other suspicious events to Harman, including a disturbing, anonymous phone call and a car lingering in the driveway.

### 3. Stalking Arrest

On May 21, Harman appeared at the house after Mr. Winks left for work. He told Mrs. Winks, who was emptying the trash, that she looked nice. Mrs. Winks felt uncomfortable and asked him to leave the property. The two began to argue about the machinery in the yard and the ruined grass. Mrs. Winks asked him to leave again, and he refused to do so. Mrs. Winks then called the sheriff's office to complain about Harman's behavior.

Deputy Kenneth Droddy responded to the call and arrived on the premises that day. Deputy Droddy spoke with Mrs. Winks, her uncle, and Harman. Because there was a dispute regarding whether Harman should be allowed in the detached garage, Deputy Droddy reviewed the lease agreement. Eventually, Deputy Droddy told Mrs. Winks she could make a criminal complaint against Harman before a magistrate. Harman, who was in disbelief that Mrs. Winks would pursue him for stalking, told Deputy Droddy that he had done many things for the Winkses, including providing a generator for them to use during a power outage. Mrs. Winks asked Deputy Droddy if he would give her a ride to the magistrate's office, and he agreed.[5]

On May 21, Mrs. Winks made a criminal complaint before the magistrate. In that complaint, she stated the following:

> On more than 5 occasions Burton Harman has made sexual comments to myself, my husband, & my uncle about how he has a "thing" for me, that I remind him of his past lover, that he has a hard time controlling his emotions when he sees me and how much better my body appears compared to his overweight wife. He appears out of nowhere when I go outside

---

[5] According to the Defendants, it is common practice for the Dinwiddie Sheriff's Office to transport complaining witnesses to the magistrate's office in cases involving domestic assaults or protective orders, if the witnesses need or request transportation.

and approaches me constantly despite the fact my husband &
myself have asked [him] to leave me alone and to not converse
with me. He has repeatedly walked into my home without
permission or announcement. I have been sitting on my sofa
with my children & looked to find him standing next to my
dining room table. I was also in my bathroom near my back
door when he walked through my back door & just started
trying to converse with me. He has been asked on numerous
occasions to not do such things, but continues to do so. All of
this has occurred within the past two weeks on multiple dates.
His behaviors cause me to feel insecure about what he may do
if he finds me without someone around. It scares me to be
home alone when he is around.

(Lesly Winks Aff., Ex. B, ECF No. 11-2, at 10-11). As a result of Mrs. Winks's complaint, the

magistrate issued a misdemeanor arrest warrant against Harman for stalking and an

emergency protective order that forbade Harman from any acts of stalking and from having

further contact with Mrs. Winks.

That day, Deputy Droddy and Deputy FNU Smith drove separate vehicles to the

premises, where Harman was working in the detached garage. Both deputies helped

Harman put a vehicle back in the garage and allowed him some time to finish his work

there. Deputy Smith took Harman into custody, and the protective order was served on

Harman. Deputy Smith—not Deputy Droddy—arrested Harman for stalking.

At the hearing on the stalking charge, the court took its decision under advisement

for approximately ninety days, during which time Harman was ordered to have no further

contact with Mrs. Winks. Because Harman did not have a criminal history, the

Commonwealth's Attorney agreed to request that the court dismiss the stalking charge if

Harman complied with the order. The court dismissed the charge after the ninety-day

period expired.

### 4. Perjury Arrest

Another power outage occurred on May 23, 2010, and lasted from 4:53 p.m. to 7:26 p.m. The Winkses went to the detached garage to get the generator and found that the key was not above the door frame. To gain access, they removed the lock on the door. They then retrieved the generator and connected it in the garage attached to the house.

On May 26, Deputy Droddy escorted Harman onto the premises, supposedly because Harman wanted to retrieve property. Instead, when on the property, Harman posted a no-trespassing sign on the detached garage. At this time, he also claimed that his generator had been stolen and wanted Deputy Droddy to arrest the Winkses for larceny and breaking and entering. Deputy Droddy spoke with Mrs. Winks, who explained that the generator was retrieved from the detached garage during a power outage and that it was in the attached garage. When Deputy Droddy asked if the Winkses would return the generator to the detached garage, they agreed to do so. Deputy Droddy noted that the generator was only 50 feet away in the attached garage, that the detached garage was part of the rental premises, and that Harman had previously allowed the Winkses to use the generator. Deputy Droddy told Harman that because the Winkses did not have an intent to permanently deprive Harman of the generator, he would not arrest them.

The following day, Deputy Droddy was dispatched to the sheriff's office for a report made by Harman of larceny of a generator. Deputy Droddy again explained to Harman that no crime had been committed and that the sheriff's office would not investigate the matter further.

Deputy Droddy consulted with one of his supervisors, Sergeant David A. Bunch, regarding this investigation, making Sergeant Bunch aware of the stalking charge and the generator issue. Harman called Sergeant Bunch several times about the detached garage

and the property in it, and Sergeant Bunch repeatedly told Harman that the Winkses had not committed any crime in using the generator. On Harman's request, Sergeant Bunch asked Mrs. Winks if she and Mr. Winks would stay out of the detached garage; she agreed. The Winkses did not go back into the detached garage.

Sometime after Harman's stalking arrest and before June 4, Terri Harman, the Plaintiff's wife, came to the sheriff's office to get the Winkses arrested for taking the generator. She was told that she would be arrested for perjury if she attempted to obtain a warrant.

Unbeknownst to any of the police officers or to the Commonwealth's Attorney for Dinwiddie County, Lisa Caruso, Harman traveled to the acting Dinwiddie County magistrate to secure felony warrants for larceny and breaking and entering against the Winkses. In the section of the criminal complaint where Harman indicated—under penalty of perjury—the basis for his belief that an offense occurred, Harman stated only the following: "help removed generator and lock hardware from body shop. value @ 950.00." (Harman Aff., Ex. K, ECF No. 15-4, at 9). The magistrate issued felony arrest warrants for larceny and breaking and entering for both Mr. and Mrs. Winks.

Sergeant Bunch later saw the Winkses in the sheriff's office waiting to be served with the felony arrest warrants. That day, he consulted with Caruso regarding the arrest warrants and informed her of the stalking charge and his discussions with Harman and the Winkses about the generator. He also expressed to Caruso his concern that a private citizen was able to obtain a felony warrant, which, by law, only law enforcement may obtain.[6]

---

[6]  Section 19.2-71 of the Code of Virginia provides, in relevant part, that
    [N]o magistrate may issue an arrest warrant for a felony offense upon the basis of a
    complaint by a person other than a law-enforcement officer or an animal control

Caruso agreed that, given the circumstances, the Winkses had not committed any crime. She advised Sergeant Bunch to take out a perjury warrant against Harman.

On June 5, Sergeant Bunch appeared before Chief Magistrate Paul Gregory and swore under oath the same facts he presented to Caruso. He also swore that Harman's criminal complaint omitted material facts. Chief Magistrate Gregory removed the Winkses' arrest warrants from the system.

Sergeant Bunch obtained a perjury warrant for Harman, and Deputy Droddy took Harman into custody. Deputy Droddy turned Harman over to Sergeant Bunch, who served the perjury warrant and took Harman before a magistrate.

The perjury charge was later *nolle prossed* in Dinwiddie County because Harman's alleged act of perjury occurred in Powhatan County, where the acting Dinwiddie County magistrate was located. At the time Sergeant Bunch obtained the perjury arrest warrant, neither he nor Caruso knew that Harman obtained the arrest warrants from a magistrate located in Powhatan County.

## B. Procedural Background

Plaintiff Harman filed this matter on October 19, 2010, against Sergeant Bunch and Deputy Droddy, in their individual capacities. Harman sets forth the following causes of action: violation of 42 U.S.C. § 1983 due to an unreasonable seizure under the Fourth Amendment (Count I), false arrest (Count II), malicious prosecution (Count III), abuse of

---

officer without prior consultation by the magistrate with the attorney for the Commonwealth or, if no attorney for the Commonwealth is available, without prior consultation with a law-enforcement agency having jurisdiction over the alleged offense.

process (Count IV), and intentional infliction of emotional distress (Count V). He seeks compensatory and punitive damages in the amount of five million dollars.

The Defendants filed the pending summary judgment motion on April 27, 2011. The parties have requested that the Court decide this motion without oral argument. After examining the record and the memoranda filed by both parties, the Court finds that oral argument is unnecessary because the facts and contentions are adequately presented and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J).

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted). In making its decision, a court must look to the affidavits or other specific facts pled to determine whether a triable issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1996). "[I]f the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c), it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted). "Mere unsupported speculation

11

is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006). Summary judgment should not be granted, however, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## B. Substantive Claims

### 1. § 1983 (Count I)

A court considering a claim of false arrest must determine whether the defendant's actions violated the plaintiff's clearly established Fourth Amendment right to be free from an unreasonable seizure at the hands of individuals acting under the color of state law. An arrest is reasonable when it is based on probable cause, *Veney v. Ojeda*, 321 F. Supp. 2d 733, 744-45 (E.D. Va. 2004), and probable cause exists "when the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003) (internal quotation marks and citation omitted) (alteration in original).

### 2. False Arrest & Malicious Prosecution (Counts II & III)

Under Virginia law, false arrest is the "restraint of one's liberty without cause therefor" or "the illegal detention of the person, without lawful process, or the unlawful execution of lawful process. *Samuel v. Rose's Stores, Inc.*, 907 F. Supp. 159, 164 (E.D. Va. 1995) (quoting *Zayre of Va., Inc. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966)); *Montgomery Ward & Co., Inc. v. Wickline*, 50 S.E.2d 387, 389 (Va. 1948) (internal quotation marks and citation omitted); *also Cole v. Eckerd Corp.*, 54 Va. Cir. 269, 2000 WL 33595085, at *2 (Va.

Cir. Ct. 2000) ("The common law tort of false imprisonment is also referred to as false arrest."). To prove false arrest, the plaintiff must show that the process that led to his arrest was unlawful. *Cole*, 2000 WL 33595085, at *2. If a warrant is facially valid, a cause of action for false arrest does not arise. Id. at *2-3.

Malicious prosecution actions are disfavored in Virginia. *Wiggs v. Farmer*, 135 S.E.2d 829, 831 (Va. 1964). To prevail on one, a plaintiff must prove:

> (1) that the prosecution was set on foot by the now defendant and that it had terminated in a manner not unfavorable to the now plaintiff; (2) that it was instituted, or procured by the cooperation of the now defendant; (3) that it was without probable cause; and (4) that it was malicious.

*Id.*; also *Reilly v. Shepherd*, 643 S.E.2d 216, 218 (Va. 2007).

To recover punitive damages resulting from false arrest or malicious prosecution, the plaintiff must show that the defendant acted with actual malice. *Giant of Va., Inc. v. Pigg*, 152 S.E.2d 271, 277 (Va. 1967). Actual malice exists when there is a lack of probable cause or when "the defendant's actions were prompted by ill will, malevolence, grudge, spite, wicked intention or a conscious disregard of the rights of another." *Peacock Buick, Inc. v. Durkin*, 277 S.E.2d 225, 227 (Va. 1981) (internal quotation marks and citations omitted).

### 3. Abuse of Process (Count IV)

Abuse of process involves the wrongful use or perversion of process after it has been issued. *Triangle Auto Auction, Inc. v. Cash*, 380 S.E.2d 649, 650 (Va. 1989). The two essential elements of such a claim are "(1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings." *Id.*; *Donohoe Constr. v. Mt. Vernon Assoc.*, 369 S.E.2d 857, 862 (Va. 1988). Process is maliciously abused when it is used oppressively. *See Mullins v. Sanders*, 54 S.E.2d 116, 122 (Va. 1949).

### 4. Intentional Infliction of Emotional Distress (Count V)

To prevail on an intentional infliction of emotional distress claim, a plaintiff must prove that: "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and (4) the resulting emotional distress was severe." *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 343 (Va. 2008).

## III. <u>OBJECTIONS</u>

### A. <u>Addendum of Disputed Facts</u>

The Plaintiff, who disagrees with 43 of the 73 facts presented in the Defendants' summary judgment motion, presented his stance on each of these facts in an 8-page, single-spaced addendum to his response. For each of the 43 facts, he restates the fact presented by the Defendants then responds. He does not cite to any part of the record for any of the disputed facts. For example, in response to the Defendant's stated fact that the Plaintiff provided the Winkses with a key to the detached garage, the Plaintiff states the following, without citation to any evidence: "The statement above is false. The Winks told Droddy that they did not have a key to the body shop. They told Mimms that they were not given access to the body shop." (Addendum, ECF No. 12-1, at 1).

The Defendants argue that the Plaintiff's use of the addendum to object to the Defendants' list of undisputed facts is improper because the Plaintiff should have included the disputed facts in the body of the responsive memorandum and because the addendum does not include any citations to the record or to any other evidence to substantiate the Plaintiff's objections. The Plaintiff has not responded to this objection.

The local rule governing summary judgment motions requires parties disputing facts to include in the responsive memorandum "a specifically captioned section listing all material facts as to which it is contended there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." Loc. R. Civ. P. 56(B); *see also* Fed. R. Civ. P. 56(c). Federal Rule of Civil Procedure 56(e) permits a court to treat as undisputed any facts not properly addressed.

In *BIS Computer Solutions, Inc. v. Halifax Corporation*, this Court found that a brief filed in opposition to a summary judgment motion failed to adhere to the requirements of Local Rule 56(B) because it "[did] not contain any citations to the parts of the record relied on to support the facts alleged to be in dispute." No. 3:05–CV–470, 2006 WL 268803, at *3 (E.D. Va. Jan. 27, 2006) (Spencer, C. J.). After finding that the undisputed facts presented by the moving party in the summary judgment were "adequately supported by citations to the record," the Court accepted the facts presented in the summary judgment motion as undisputed. *Id.*

Harman's failure to abide by the rules governing genuine disputes of material facts warrants a similar response from the Court. The addendum makes no citations to the record and only includes the Harman's beliefs and assertions. Due to the Plaintiff's failure to adhere to the federal and local rules, the Court sustains the Defendant's objection and does not consider the list of disputed facts included in the addendum.[7]

## B. <u>Exhibits</u>

---

[7] The Plaintiff has disputed some facts in the body of his responsive memorandum. The Court considers those below.

The Plaintiff filed a timely response to the summary judgment motion; however, he did not file the exhibits and attachments referenced in that motion until the date after the filing deadline due to difficulties he experienced with attaching the files to the memorandum. The Plaintiff objects to the Court's consideration of those exhibits, arguing that "[a]ccording to the Court's Electronic Case Filing Policies and Procedures, technical difficulties encountered on the filing users' end do not excuse untimely filing." (Reply, ECF No. 16, at 2). The Plaintiff has not responded to this objection.

While the Plaintiff's difficulties do not excuse his failure to adhere to the filing deadlines, the Court find that considering the exhibits will not prejudice the Defendants. The untimely filed exhibits are either duplicative of exhibits filed by the Defendants, full of inadmissible hearsay, or unnecessary for the resolution of this matter. The only exception is the criminal complaint Harman swore out against the Winkses and the felony arrest warrants that resulted. Because the Court's consideration of the complaint and the warrants does not prejudice the Defendants or alter the Court's decision, the Court overrules the Defendants' objection to the exhibits.

## IV. DISCUSSION

### A. Material Facts

Plaintiff Harman contends that summary judgment is not appropriate because nine material facts are in genuine dispute. Specifically, he alleges that Mrs. Winks's stalking story is not credible; that Mrs. Winks wanted police to remove Harman from the property, not to arrest him for stalking; that the Winkses did not have a key to the body shop; that the Winkses removed the generator from the detached garage the day before the power

outage, not the day of the outage; that Harman did not commit perjury because the comments in his criminal complaint were factual; and that Sergeant Bunch could have learned that Harman did not commit perjury if he had consulted with another deputy who interacted with Harman and the Winkses and who was listed as a witness on the criminal complaint.

The facts alleged to be in dispute by the Plaintiff are either not material for purposes of this lawsuit against Sergeant Bunch and Deputy Droddy or are the Plaintiff's arguments thinly disguised as facts. Three of the five claims alleged (i.e., false arrest under § 1983, common-law false arrest, and malicious prosecution) turn on whether Sergeant Bunch and Deputy Droddy had probable cause to arrest Harman for stalking and perjury. As discussed in greater detail below, Mrs. Winks's sworn criminal complaint provided probable cause for the stalking arrest warrant, and Harman's omission of material facts from his criminal complaint against the Winkses provided probable cause for the perjury arrest warrant. Thus, to the extent that the Plaintiff presents issues in genuine dispute, they are not material to the probable cause issue and thus do not make summary judgment inappropriate.

Furthermore, none of the facts disputed by Harman address the elements of the fourth and fifth causes of action. To prove abuse of process, Harman must show that the Defendants had an ulterior purpose and that they committed an act in the use of the process that was improper. None of the facts disputed by Harman addresses these elements. To succeed of the fifth count, intentional infliction of emotional distress, Harman must show that the Defendants' conduct was outrageous or intolerable. Again, none of the facts disputed by Harman addresses this required showing.

17

For these reasons, the Court finds that the Plaintiff has not raised any genuine issues of material fact and that summary judgment is appropriate.

## B. <u>Stalking Arrest</u>

Of the two Defendants, only Deputy Droddy was involved with Harman's stalking arrest. Specifically, Deputy Droddy responded to the call Mrs. Winks made to the sheriff's office about Harman's behavior. He spoke with Mrs. Winks, her uncle, and the Plaintiff and also reviewed the lease agreement because there was a dispute regarding whether Harman should be allowed in the detached garage. Deputy Droddy informed Mrs. Winks that she could make a criminal complaint before a magistrate and drove her to the magistrate's office. After the magistrate issue a protective order and a misdemeanor arrest warrant against Harman for stalking, Deputy Droddy drove his vehicle to the premises, where Deputy Smith arrested Harman for stalking.

Because Deputy Droddy did not arrest Harman for stalking, Harman has no cause of action for false arrest against him. To the extent that Deputy Droddy assisted Deputy Smith in arresting Harman, his actions were pursuant to a facially valid arrest warrant and, therefore, the arrest was reasonable. *See Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998); *Cole*, 2000 WL 33595085, at *2.-3 As the Defendants note, "There is no evidence to show Droddy had reason to doubt Mrs. Winks' story nor is there any evidence that Droddy omitted facts from the magistrate." (Mem. Supp., ECF No. 11, at 17). The Plaintiff asks the Court to make numerous assumptions and suppositions to conclude that Deputy Droddy should have known that Mrs. Winks's story was false and that Deputy Droddy coerced Mrs. Winks to falsify the statements in her criminal complaint. The evidence simply does not support the Plaintiff's version of events.

For these reasons, the Court finds that Deputy Droddy had probable cause to assist Deputy Smith in arresting Harman and that Deputy Droddy did so pursuant to a facially valid arrest warrant. As a result, the Court grants the summary judgment motion—as it pertains to the stalking arrest—on the § 1983, false arrest, and malicious prosecution claims. Also, because the Plaintiff has not shown that Deputy Droddy arrested Harman with an ulterior purpose or that his conduct was outrageous or intolerable, the Court finds that he has not met his burden on the abuse of process and intentional infliction of emotional distress claims.

## C. Perjury Arrest

Both Defendants were involved in Harman's perjury arrest. Deputy Droddy escorted Harman onto the premises on May 26, when Harman requested that Deputy Droddy arrest the Winkses. Deputy Droddy spoke with Mrs. Winks, located the generator, and informed Harman that the Winkses did not have an intent to permanently deprive him of the generator and that he would not arrest them for using the generator. The next day, Deputy Droddy again explained to Harman that no crime had been committed and that the sheriff's office would not investigate the matter further. Deputy Droddy also took Harman into custody after Sergeant Bunch obtained the perjury warrant.[8]

Sergeant Bunch discussed the generator and detached garage issues with Harman, who called him numerous times. After seeing the Winkses waiting to be served with the

---

[8]   Section 18.2-434 of the Code of Virginia, which establishes perjury as a felony, provides in relevant part that

> If any person to whom an oath is lawfully administered on any occasion willfully swears falsely on such occasion touching any material matter or thing, . . . or if any person in any written declaration, certificate, verification, or statement under penalty of perjury pursuant to § 8.01-4.3 willfully subscribes as true any material matter which he does not believe is true, he is guilty of perjury, punishable as a Class 5 felony.

felony arrest warrants, Sergeant Bunch consulted with Caruso, swore under oath the facts related to the generator issue, obtained the perjury warrant, served the warrant on Harman, and took Harman before a magistrate.

Sergeant Bunch believed that Harman committed perjury in obtaining the arrest warrants because he omitted material facts from his criminal complaint. For example, Harman's complaint does not indicate that "the Winks were [Harman's] tenants, he let them use the generator before, the generator was on the Premises, it was only 50 feet from [the] detached garage, and [] he had already reported larceny and breaking and entering and had been told no crime had been committed." (Mem. Supp., ECF No. 11, at 18).

From his interactions with Harman, his understanding of the circumstances of the Winkses' tenancy, and his consultation with Caruso, Sergeant Bunch had enough evidence to warrant his belief that Harman willfully subscribed as true material matters that he knew were untrue—that is, that he committed perjury under Section 18.2-434 of the Code of Virginia. The evidence supporting Sergeant Bunch's belief that Harman committed perjury created sufficient probable cause for him to obtain an arrest warrant for perjury. *Gantt v. Whitaker*, 57 Fed. App'x 141, 147 (4th Cir. 2003) (Probable cause requires "only enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed . . . .").

Because there was probable cause for the arrest warrant, the actions Deputy Droddy and Sergeant Brunch took pursuant to that warrant did not violate Harman's Fourth Amendment rights and did not constitute false arrest or malicious prosecution. Furthermore, because the Plaintiff has not shown that Sergeant Bunch obtained the arrest warrant with an ulterior purpose or that his conduct was outrageous or intolerable, the

20

Court finds that he has not met his burdens on the abuse of process and intentional infliction of emotional distress claims.

## V. <u>CONCLUSION</u>

For these reasons, the Court GRANTS the Defendant's motion for summary judgment.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate order shall issue.

/s/
_____
James R. Spencer
Chief United States District Judge

ENTERED this ___16th___ day of June 2011.